# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 7, 2016

## STATE OF TENNESSEE v. TRACEY MCQUINN TAYLOR

**Appeal from the Circuit Court for Madison County**
**No. 14-469    Donald H. Allen, Judge**

_____

**No. W2015-02250-CCA-R3-CD – Filed January 20, 2017**

_____

A Madison County jury found the Defendant, Tracey McQuinn Taylor, guilty of two counts of aggravated robbery and one count of felon in possession of a firearm. The trial court sentenced him to concurrent sentences of twelve years for each count of aggravated robbery to be served consecutively to a four year sentence for the felon in possession of a firearm conviction. On appeal, the Defendant asserts that the evidence is insufficient to support his convictions and that his sentence is excessive. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Kortney D. Simmons, Jackson, Tennessee, for the appellant, Tracey McQuinn Taylor.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Jerry Woodall, District Attorney General; and Brian M. Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a robbery of two victims, Justiss Williamson and Demarcus Cook, on May 11, 2014, in Jackson, Tennessee. A Madison County grand jury indicted the Defendant for two counts of aggravated robbery and one count of felon in possession of a firearm. At trial, the parties presented the following evidence: Justiss Williamson testified that, on May 11, 2014, he was visiting his cousin, T.C.,[1] in Jackson, Tennessee. While there, he and another cousin, Demarcus Cook, contacted a friend, Tahj Transou, to

_____

[1] It is the policy of this Court to refer to minors by their initials.

arrange to meet and buy some marijuana. Tahj Transou did not sell marijuana but knew someone who did.

Mr. Williamson testified that Tahj Transou arrived in a four-door white car with four or five other males. Mr. Williamson and Mr. Cook went outside at approximately 1:00 or 2:00 a.m. to buy and smoke the marijuana. Mr. Williamson purchased a blunt, and the group stood around outside the car smoking the marijuana. At some point, the Defendant, who wore his hair in dreadlocks, stepped around from behind the vehicle brandishing a handgun. He pointed the gun at Mr. Williamson's head and demanded, "Give me everything you got." Mr. Williamson, who was shocked, gave the Defendant the "Polo" hat he had been wearing because the Defendant had a gun pointed at him. Mr. Williamson observed Mr. Cook give the Defendant his lip balm, lighter, and wallet. Mr. Williamson recalled that the others, except for Tahj Transou, stood around laughing as the Defendant robbed Mr. Williamson and Mr. Cook.

Mr. Williamson testified that, after taking their personal items, the Defendant ordered Mr. Williamson and Mr. Cook to "get on the back of the car." Everyone else present got inside the car, and the driver drove the car around the corner. Mr. Williamson and Mr. Cook were then allowed to get off the car trunk, and the car drove away. Mr. Williamson and Mr. Cook walked back to T.C's residence where they contacted the police. Mr. Williamson estimated that the robbery took approximately fifteen minutes and that he was on the trunk of the car for approximately two minutes. He confirmed that, although he had smoked marijuana, he sobered up when the Defendant produced the gun and that the marijuana did not cloud his ability to understand the events or identify the perpetrator. He described his clarity as his "adrenaline kick[ing] in."

On cross-examination, Mr. Williamson confirmed that he had never seen the Defendant before the night of the robbery. Mr. Williamson agreed that he did not contact the police until an hour after the robbery. He explained that once he walked back to T.C.'s house, he was unsure of what to do at first. He woke up T.C. and told him what had happened and then woke up his aunt and uncle before calling the police.

On redirect examination, Mr. Williamson agreed that he had identified the Defendant in a photographic lineup at the police station. He stated that upon seeing the Defendant's photograph he knew "exactly" who the Defendant was, and at trial he remained certain that the Defendant perpetrated this robbery.

Demarcus Cook testified that Mr. Williamson had arranged to purchase the marijuana and that Mr. Cook did not know any of the people who came to the residence to sell the marijuana. Mr. Cook accompanied Mr. Williamson outside to meet the men because he did not think it safe for Mr. Williamson to go alone. Mr. Williamson bought a

blunt from the men, lit the blunt, and then passed it around. After finishing the blunt, the Defendant walked around from behind the car with a gun and ordered Mr. Williamson and Mr. Cook to empty their pockets. When asked if he saw the person in the courtroom who approached him with a gun, Mr. Cook responded that he was not sure. He explained that, because he was "so mad" at that time, he did not "really get a good look at his face." Mr. Cook described the perpetrator as a black male who wore his hair in dreadlocks and had a "grill." He said the perpetrator held a gray chrome .380 caliber handgun.

Mr. Cook testified that he gave the robber his dog tag, necklace, phone, wallet, Carmex, and body oil. Mr. Cook had $95.00 dollars in his wallet. Next, the man ordered Mr. Cook and Mr. Williamson on to the trunk of the car while the other men laughed. The two men rode on the trunk of the car for a short distance before they were "dropped [ ] off." Mr. Cook and Mr. Williamson then returned to T.C.'s house. After returning to the house, Mr. Cook called his mother who instructed him to call the police.

Mr. Cook confirmed that he had identified the Defendant as the perpetrator in a photographic lineup. At trial, however, he stated that he did not know if he "picked the right person." He explained that his brother had died the night before trial and his mind was "still jumping back and forth." He agreed that his memory of the events was probably better at the time of the photographic lineup than at the time of trial.

On cross-examination, Mr. Cook agreed that he had contacted the Defendant's attorney and told the attorney that he was unsure of his identification. He explained that he did so because he wanted to avoid going to trial. He said that he believed he could have "handled it" himself. He said that he knew the Defendant had committed the robbery but he had told the Defendant's attorney he did not know.

Tahj Transou testified that he knew of the Defendant because he grew up with the Defendant's brothers. Tahj Transou arranged for Mr. Williamson to buy some marijuana from his friend Michael Transou.[2] Michael Transou and the Defendant picked up Tahj Transou at his grandmother's house in Ashport. There were two other people in the car that Tahj Transou did not know. The group drove to T.C.'s house to meet Mr. Williamson and Mr. Cook. Tahj Transou knocked on a house window and beckoned Mr. Williamson to come outside. Mr. Williamson and Mr. Cook came outside.

Tahj Transou testified that, while the group was smoking a blunt, he overheard Michael Transou and the Defendant talking and laughing. Based upon what he heard, he thought "they fixing to do something except to me." The men continued smoking and

_____

[2] Although the two men shared the same last name, Tahj Transou was unsure whether the two were related. He testified that he met Michael Transou at "alternative school." For clarity, we will refer to both by their full names.

3

then Tahj Transou sat down in the back seat of the car with the car door open. Michael Transou joined him in the back seat, and then Tahj Transou saw the Defendant walk around the car holding a silver and black handgun and order Mr. Williamson and Mr. Cook to "give him their stuff." Tahj Transou had seen the Defendant with the gun on the drive to T.C.'s house. Tahj Transou asked Michael Transou, "[I]s he playing?" Michael Transou laughed and then told Tahj Transou "[N]o, bro, he for real." Tahj Transou watched the Defendant take items from Mr. Williamson and Mr. Cook. The Defendant told the two men to sit on the trunk of the car and then one of the men drove about a mile down the road before allowing Mr. Williamson and Mr. Cook to get off of the trunk. Tahj Transou was then driven home. On the way, the Defendant warned him not to say "nothing."

On cross-examination, Tahj Transou confirmed that, after the incident, he identified the Defendant from some photographs shown to him by police.

Richard Newbill, a Jackson Police Department sergeant, testified that he worked on the fugitive apprehension team, and on May 12, 2014, he learned of an address associated with the Defendant. When he arrived at the residence, he saw a man matching the Defendant's description looking out the front door. Sergeant Newbill exited his vehicle and knocked on the door for "at least five minutes" before three males answered the door. None of these subjects were the man Sergeant Newbill initially saw looking out the door. A deputy marshal at the rear of the house heard movement in the attic area, and the three men were evasive in their answers about whether or not the Defendant was in the residence. One of the investigators contacted the homeowner and received permission to search the residence for the Defendant. The Defendant was found lying on the floor in the attic with a jacket and a loaded silver and black handgun within arm's reach. The gun, a Taurus nine-millimeter handgun, was recovered as evidence, and it was later discovered that it had been reported stolen.

Greg Gookin testified for the defense that he had previously represented the Defendant in this case. His representation of the Defendant was terminated after Mr. Gookin spoke with Mr. Cook by telephone on January 16, 2015. Mr. Gookin returned Mr. Cook's telephone call, and Mr. Cook asked if they could discuss the case. Mr. Gookin asked Mr. Cook if he was high at the time of the incident, and Mr. Cook confirmed that he was high. Mr. Gookin also asked about the photographic lineup and Mr. Cook stated that he was "unsure" and had just "picked somebody." Mr. Gookin advised Mr. Cook to contact the district attorney's office because it was the prosecutor who would decide how to proceed with the case. After speaking with Mr. Cook, Mr. Gookin spoke with the Defendant and then the prosecutor.

On cross-examination, Mr. Gookin testified that Mr. Cook never asked to speak with the Defendant. Mr. Gookin said that Mr. Cook seemed "doubtful" about his identification and appeared to want "the whole thing to be over."

Michael Transou testified that on May 11, 2014, he rode with Greg Hamlett to deliver marijuana to Mr. Williamson. He described Mr. Hamlett as "kind of muscular," with dreadlocks and a "grille." The men drove in Mr. Hamlett's girlfriend's white, four-door car along with two "dudes" who rode in the back seat and Mr. Transou. When they arrived at T.C.'s house, they smoked marijuana for "a little bit." At some point, Mr. Hamlett asked if the rest of the men were ready to leave and then as "everybody" started walking toward the car, Mr. Hamlett pulled a pistol on Mr. Williamson and Mr. Cook. Mr. Hamlett took Mr. Williamson's and Mr. Cook's personal belongings and then ordered them to sit on the trunk of the car. Mr. Hamlett drove the car to the end of the street and then told Mr. Williamson and Mr. Cook they could get off of the trunk. Michael Transou denied that the Defendant was with them that night and stated that he did not see the Defendant until two or three days after the robbery.

On cross-examination, Michael Transou confirmed that the Defendant was "like a big brother to him" and described the Defendant as a family friend and his "good friend." Michael Transou stated that he had met Mr. Hamlett three to four weeks before the robbery at T.R. White. He said that Mr. Hamlett was "from Memphis" and that he had not seen or heard from Mr. Hamlett since the night of the robbery.

Tahj Transou testified for the State in rebuttal. Tahj Transou stated that he did not know anyone named Greg Hamlett but that he might have heard the name "Greg" associated with one of the people in the car on the night of the robbery. He said that he had never heard Michael Transou speak of a Greg Hamlett. Mr. Transou said that no one else in the car that night "looked like" the Defendant. Of the people in the car on the night of the robbery, only the Defendant and Michael Transou wore their hair in dreadlocks.

Based upon this evidence the jury convicted the Defendant of two counts of aggravated robbery and one count of felon in possession of a firearm. The trial court sentenced the Defendant to concurrent sentences of twelve years for each count of aggravated robbery to be served consecutively to a four-year sentence for the felon in possession of a firearm conviction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that the evidence is insufficient to support his convictions because the State failed to prove his identity as the robber, failed to prove that the victims were fearful, and failed to prove that the Defendant was in possession of a firearm. The Defendant also asserts that his sentence is excessive because the trial court incorrectly considered enhancement factors and failed to consider any mitigating factor other than the Defendant's young age. The State responds that it produced sufficient evidence to prove that the Defendant committed these offenses and that the trial court properly sentenced the Defendant. We agree with the State.

## A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded by statute*

*on other grounds as stated in State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

A conviction for aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and that the robbery was "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401(a), -402(a)(1) (2014).

The evidence, viewed in the light most favorable to the State, shows that the Defendant approached the victims from behind a car and, while pointing a gray and black handgun at them, demanded their belongings. Mr. Williamson and Mr. Cook complied, giving the Defendant the items on their person while and because they were being held at gunpoint. The Defendant then ordered them onto the trunk of the car where they sat while the car was driven a short distance and then the men were allowed to get off of the trunk of the car before the car drove away. Mr. Williamson and Mr. Cook both identified the Defendant as the perpetrator in a photographic lineup following the robbery. Tahj Transou also identified the Defendant as the perpetrator of these offenses. The Defendant was later arrested after police officers found him hiding in an attic with a gun matching the description of the gun used in the robbery within arm's reach. We conclude that this is sufficient evidence upon which a jury could reasonably conclude that the Defendant stole property from the victims by placing them in fear with the use of a gun.

As to the Defendant's argument about identity, we acknowledge that the identity of a perpetrator is an essential element of any crime and that Mr. Cook was unable or unwilling to identify the Defendant in court at trial. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). There was, however, identity evidence presented to the jury. Mr. Williamson testified, identifying the Defendant, and Tahj Transou, who was present during the robbery, also identified the Defendant as the perpetrator of the robberies. Issues regarding identity are questions of fact to be determined by the jury. *State v. Vaughn*, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998). Any conflicts in witness testimony regarding the identity of the accused and the weight to be afforded the testimony are issues resolved by the jury. *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). By its verdict, the jury accredited the testimony identifying the Defendant as the perpetrator, and this Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury.

The Defendant also argues that the State presented insufficient evidence that he was in possession of a firearm. Tennessee Code Annotated section 39-17-1307(b)(1)(B) prohibits a person who has been convicted of a felony drug offense from possessing a firearm. The Defendant does not dispute that he had a prior felony conviction for a drug offense, he only challenges his possession of the gun. Police found the Defendant hiding on the floor of an attic in someone else's home with the gun matching the description of the gun used in the robbery within arm's reach. In our view, the facts presented at trial allowed for a reasonable inference that the Defendant was in constructive possession of the gun when arrested.

Accordingly, we conclude that the State presented sufficient evidence to support the Defendant's convictions. Therefore, the Defendant is not entitled to relief on this issue.

## B. Sentencing

The Defendant challenges his twelve year sentences for the aggravated robbery convictions. He asserts that the trial court failed to consider the circumstances surrounding the Defendant's "upbringing" in determining a sentence and placed too much weight on his prior conviction and juvenile adjudications. The State responds that the trial court properly sentenced the Defendant. We agree with the State.

At the sentencing hearing, the State submitted the pre-sentence report as evidence. The Defendant's grandmother testified that she had been involved in raising the Defendant. The Defendant's mother raised him alone with no involvement from his father. She described the Defendant as "sensitive" but acknowledged that he had made

"mistakes." She expressed concern that the Defendant "have a chance" and, noting his young age, that he not be confined for "his youth." She said the Defendant now had a daughter who was born during his incarceration that she wanted him to have the opportunity to raise. She confirmed that, if the Defendant were released, she would be his "support system."

After hearing the evidence the trial court stated that in determining the sentence it had considered the evidence presented at trial and at the sentencing hearing, the presentence investigation report, the principles of sentencing, and the attorneys' arguments. The trial court stated that the Defendant was a Range I offender with a sentencing range of eight to twelve years for each of the two Class B felony offenses. The trial court then considered enhancement and mitigating factors. As to enhancement factors, the trial court found applicable factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. *See* T.C.A. § 40-35-114(1). The trial court noted the Defendant's one adult conviction from Madison County. The Defendant was given a Community Corrections sentence for this conviction. The trial court also considered previous criminal behavior, finding that the Defendant began drinking at the age of sixteen and used marijuana daily from the age of fourteen. The trial court placed "great weight" on the criminal behavior of drug use and the prior felony conviction.

Next, the trial court found enhancement factor (8) applicable, that the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community. *See* T.C.A. § 40-35-114(8). The Defendant was serving a Community Corrections sentence when he committed the current offenses. The trial court also gave "great weight" to this factor. The trial court found enhancement factor (16) applicable, that the Defendant had previously been adjudicated to have committed delinquent acts that would constitute a felony if committed by an adult. *See* T.C.A. § 40-35-114(16). The trial court noted the Defendant's four juvenile adjudications for aggravated burglary and four adjudications for theft of property greater than $500 from the juvenile record. The trial court placed great weight on these adjudications. The trial court noted that the Defendant had been before the juvenile court on "numerous occasions," recognizing the lengths to which the juvenile court went in an unsuccessful attempt to rehabilitate the Defendant. The juvenile offenses occurred within months of one another and, in some cases, the Defendant committed these acts while still serving some type of probation for the previous offense. The record reflects that the juvenile court ordered assessments as well as treatment for the Defendant during this three-year period of repeated offenses. In June 2011, the Defendant was adjudicated for simple assault although the affidavit indicated that the victim's jaw was broken in two places. The Defendant was ordered to pay restitution in this case, as well as others, and failed to do so. About this juvenile history the trial court stated:

You know, it's just unfortunate because that's, you know, that's what the juvenile court system tries to do is to rehabilitate but clearly, based upon what's in this report, all of those efforts failed, that is [the Defendant] failed to follow the rules of probation as a juvenile.

So, again, I give that history great weight in terms of sentencing in this matter here today.

The trial court then considered mitigating factors and found only one applicable, that the twenty-one-year-old Defendant was young. The trial court gave the Defendant's age "slight weight."

The trial court noted that, according to the records, the Defendant had refused recommended counseling. The trial court then acknowledged the Defendant's grandmother's concerns regarding her grandson but remarked that the Defendant had "refused to try to better himself, refused to try to make a life for himself." As such, the trial court found that the Defendant lacked the potential for rehabilitation. The trial court then ordered the Defendant to serve twelve years for each count of aggravated robbery.

Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, 380 S.W.3d at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708. We are also to recognize that the defendant bears "the burden of showing that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2014); *see also Bise*, 380 S.W.3d at 699 n.33, 704; *Carte*r, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

Our review of the record shows that the trial court ordered a within range sentence that is consistent with the purposes and principles of the Sentencing Act. The offenses were Class B felonies with a sentencing range of eight to twelve years for each offense. After considering all the evidence, the trial court found that multiple attempts at rehabilitation had failed, that the Defendant had declined to seek help, and that he had a significant history of criminal behavior beginning while he was a minor. The trial court considered both the Defendant's grandmother's testimony and the Defendant's young age before ordering a sentence. The trial court's findings are supported by the record and in compliance with the purposes and principles of the Sentencing Act. Accordingly, we affirm the trial court's sentences.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

11